**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAKE ANDREWS, derivatively on behalf of MONGODB, INC.,<br><br>Plaintiff,<br>v.<br><br>DEV ITTYCHERIA, MICHAEL LAWRENCE GORDON, SRDJAN TANJGA, ARCHANA AGRAWAL, ROELOF BOTHA, HOPE COCHRAN, FRANCISCO D'SOUZA, CHARLES M. HAZARD, JR., TOM KILLALEA, ANN LEWNES, JOHN MCMAHON, CEDRIC PECH, and DWIGHT MERRIMAN,<br><br>Defendants,<br><br>-and-<br><br>MONGODB, INC., a Delaware Corporation,<br><br>Nominal Defendant. | Civil Action No. __________<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Blake Andrews ("Plaintiff"), derivatively on behalf of MongoDB, Inc. ("MongoDB" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Baxter v. MongoDB, Inc., et al.*, Case No. 1:24-cv-05191 (S.D.N.Y); (iii) confidential documents produced to Plaintiff in response to a demand for inspection of books and records pursuant to 8 *Del. C.* § 220; (iv) corporate governance documents available on the Company's website; (v) media reports; and (vi) other

publicly available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of MongoDB, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least June 1, 2023, to May 30, 2024 (the "Relevant Period"). During that time the Defendants (as defined herein) caused or allowed MongoDB to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. MongoDB sells document database platforms and related software services. Since 2022, the Company has recognized revenue for its signature database product, Atlas, based on customer "consumption" of its platform, that is, a customer's actual usage of the database. Previously, MongoDB sold a license to customers for a specific period of time through upfront commitments. The shift to consumption-based or "pay-as-you-go" payment was made when the Company observed a decrease in usage of the database platform.

3. In order to promote the consumption model, MongoDB changed its compensation model for its sales team. Instead of providing incentives for obtaining one-year commitments, the Company began incentivizing the acquisition of new "workloads," specific software applications that new and existing customers use on MongoDB's data platform. One way to obtain new workloads was through acquiring new customers, and that became the Company's focus.

4. During the Relevant Time Period, Defendants learned that focusing on the amount of new workloads or customers acquired did not equate to a corresponding rate of consumption. In other words, growing the number of customers and workloads did not create actual growth in usage of the Company's database platform long-term. This realization came because the Company

tracked and analyzed consumption data, consumption trends, sales productivity, and other data concerning usage of the Atlas product. [redacted]

5. Instead of acknowledging that consumption rates were declining and that growth in workloads did not correspond to growth in consumption, Defendants told investors that the Company was acquiring new customers and workloads at record pace and that those workloads were resulting in "more efficient growth" and positioning the Company for "better" long-term growth.

6. At the same time, certain officers and directors of MongoDB sold Company stock at artificially inflated prices. They collectively sold over $286 million of stock during the Relevant Period while in possession of material non-public information about decreasing consumption rates, thereby profiting from their failure to disclose the truth to the market.

7. On May 30, 2024, the Company lowered its revenue guidance for fiscal year ("FY") 2025. In issuing the lowered guidance, the Company admitted that the new workloads acquired in FY 2024 grew more slowly than expected. The Company also revealed that, months prior, it had already began restructuring its sales strategy to focus on "higher-quality workloads that have higher growth potential."

8. In response to these revelations, the price of MongoDB's common stock declined dramatically from a closing market price of $310.00 per share on May 30, 2024, to $236.06 per share on May 31, 2024, a 24% decline of MongoDB's market value in just one day.

9. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

10. Plaintiff Blake Andrews is a current shareholder of MongoDB, has continuously held MongoDB stock during all times relevant hereto, and is committed to retaining MongoDB shares through the pendency of this action to preserve Plaintiff's standing. Plaintiff will adequately and fairly represent the interests of MongoDB and its shareholders in enforcing its rights.

### B. Nominal Defendant

11. Nominal Defendant MongoDB is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 1633 Broadway, 38th Floor, New York, NY 10019. MongoDB common stock trades on the Nasdaq Stock Market under the ticker symbol "MDB."

### C. Individual Defendants

12. Defendant Dev Ittycheria has served as a director of the Company since 2014. Defendant Ittycheria served as President and Chief Executive Officer ("CEO") of the Company from 2014 until November 2025.

13. Defendant Michael Lawrence Gordon served as the Company's Chief Financial Officer ("CFO") from 2015 until November 2018. In November 2018, Defendant Gordon took on a dual role as the Company's CFO and Chief Operating Officer ("COO"), which role he held until January 31, 2025.

14. Defendant Srdjan Tanjga served as the Senior Vice President of Finance for the Company from 2021 until January 2025, and then served as interim CFO until May 2025, when he resigned.

15. Defendant Archana Agrawal has served as a Company director since 2019.

16. Defendant Roelof Botha has served as a Company director since 2013.

17. Defendant Hope Cochran has served as a Company director since 2016.

18. Defendant Francisco D'Souza has served as a Company director since 2019.

19. Defendant Charles M. Hazard, Jr. has served as a Company director since 2009.

20. Defendant Tom Killalea has served as a Company director since 2015 and as Chairperson of the Board since 2019.

21. Defendant Ann Lewnes has served as a Company director since December 2023.

22. Defendant John McMahon served as a Company director between 2016 and June 2024.

23. Defendant Dwight Merriman is a co-founder of the Company and has served as a Company director since 2020. He also served as a Company advisor from 2007 until becoming a director in 2020.

24. Defendant Cedric Pech served as Chief Revenue Officer of the Company from 2019 to December 9, 2024, when he was promoted to President, Field Operations. He held that position until his resignation on April 15, 2026.

25. Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, Merriman, and McMahon are herein referred to as "Director Defendants."

26. Defendants Ittycheria, Gordon, and Pech are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

28. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

30. Venue is proper in this court under 28 U.S.C. § 1391, because MongoDB is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Company Background

31. The Company was founded in 2007 as 10Gen as a way to create a more scalable and flexible solution for storing and managing data at high volume and velocity for developers. 10Gen launched the MongoDB (short for "humongous database") product in 2009. MongoDB is like a Word file, where developers can write in data however they want, making it a more flexible environment for data, search, coding, integration and database development. In 2016, the Company launched Atlas, a cloud-based database platform that now accounts for more than 70% of the Company's revenues. The Company also offers a non-cloud-based database platform called Enterprise Advanced ("EA").

32. The Company has looked to new workloads to continue to grow Atlas. During the 2023 Investor Session, Defendant Gordon said that the "whole company is oriented around winning more workloads," and that acquiring workloads is a "focus across the whole company." Defendant Ittycheria echoed the same sentiment in an August 2023 earnings call: "[o]ver the last

few years, we have oriented our entire company around winning more workloads." The acquisition of new Atlas workloads was deemed essential for the Company's long-term growth.

33. Before 2022, the Company sold its database platform through a perpetual license, where customers entered into large, upfront commitments to use the software for a period of time. The Company switched to consumption-based pricing in 2022, where customers pay for what they use and get billed for their consumption (or usage). In a consumption model, the "'closing' of a deal is really just the start of the journey," as MongoDB's head of sales, Meghan Gill, explained.

34. The consumption-based pricing model was designed to increase the number of workload acquisitions more quickly and without the burdens of negotiating upfront commitments. To incentivize the move to consumption-based sales, the Company began compensating its sales representatives based on the customer's "run rate" at the end of a quarter, which was in turn based on the customer's actual consumption. Gill's sales team created what they called a "run rate opportunity" in Salesforce – a customer relationship management ("CRM") software tool used by MongoDB to track sales, consumption, and other customer-related information – that would "update[] every day with the consumption" and "close[] at the end of the quarter so that it can be tracking the consumption of that customer over time."

35. At the start of FY 2024, the Company decided to incentivize workload sales volume by no longer compensating sales representatives for obtaining one-year commitments from customers. As Defendant Ittycheria explained during MongoDB's August 31, 2023, earnings call:

> We are highly focused on reducing friction in the sales process so we can acquire more workloads quickly and cost effectively given the large size of our market opportunity. Historically, the most significant source of friction has been negotiating with customers to secure an upfront Atlas commitment since it can be hard for customers to forecast consumption growth for a new workload. Given our high retention rates and the underlying consumption growth, several years ago, we began reducing the importance of upfront commitments in our go-to-market

> process to accelerate workload acquisition. This year, we took additional steps in that direction.
>
> For example, we no longer incentivize reps to sign customers to 1-year commitments. Obviously, this has short-term impact on our cash flow, but positions us better for the longer term by accelerating workload acquisition. We are pleased with the impact these changes have had in the business in the first half of the year. Specifically, new workload acquisition has accelerated, especially within existing customers. We believe that our efforts to reduce friction are resulting in more efficient growth, and we'll always look for ways to improve our go-to-market approach to make it even easier for customers to bring new workloads onto our platform.

36. Defendant Gordon elaborated further during the August 2023 earnings call:

> Finally, as Dev mentioned, we continue deemphasizing the value of upfront commitments. So we're seeing fewer of them. In other words, we are intentionally collecting less cash upfront in order to win more workloads more quickly. As evidence of this, we grew Atlas revenue 38% year-over-year, while Atlas dollars committed upfront actually declined by 15% year-over-year.

37. At the September 6-7, 2023, Goldman Sachs Communacopia + Technology Conference ("2023 GS Conference"), Defendant Ittycheria responded to a question about the change to consumption pricing for Atlas and confirmed the importance of the change and that the Company was "orienting our go-to-market organization to just acquire new workloads." He explained that "we stopped paying our salespeople [] even on 1-year commitments because our retention rates are very high." He also stressed the effectiveness of the new strategy, stating that the "removal of that friction based on the change in comp plans has really helped us accelerate the acquisition of new workloads . . . And we're really pleased by the velocity of workloads that we're acquiring."

38. In addition to the change in the incentive structure, the Company restructured its sales teams at the beginning of FY 2024. One new team focused solely on acquiring new "logos" (new customers launching a new workload), and one team focused on growing existing accounts. The team focused on acquisitions would be compensated based on the number of workloads

acquired. The emphasis on growing the number of new workload acquisitions, the elimination of incentives for upfront commitments, and compensating sales representatives for new logos allowed the Company to do exactly as planned--to acquire more workloads faster.

39. In a workshop presentation on November 1, 2023 entitled "Rethinking Sales Compensation for a Consumption-Based GTM with MongoDB," Ms. Gill explained that while the new compensation strategy for the acquisition team was "dead simple" because it "really focuses the reps and it will drive a lot of velocity and activity," it runs the risk of driving "low-quality" workloads. This, she revealed, is what happened at the Company after it implemented its pricing changes at the beginning of FY 2024:

> The con is that it's always harder to overachieve on a unit-based plan which is why it's potentially good to have a blend to mix the elements of ARR and something unit-based. And when you have a unit-based plan you always run into [laugh] the risk of driving a lot of low-quality stuff. So when we first introduced our new logo team, it was a pure unit-volume game, and they just had to sign a contract. And we had a lot of reps that were overachieving, landing [gesturing air quotes] "new logos" that had signed a contract but never even actually consumed. So that's when we started introducing, like okay, [] now in order for you to get your, your unit-based payment, the customer has to consume at a certain level, um in order for you to get credit for that. And then later on we then introduced ARR. So now they get a mix of um, ARR and this unit-based metric in their comp plan.

40. In other words, the Company's revamped compensation plan incentivized "a lot" of sales representatives to acquire new customers that "never actually consumed." Around this time, the Company began making more changes to its sales compensation plans to fix this issue.

41. Another issue that developed was that the data relied upon by the Company to determine growth and consumption rates was not as reliable as it was presented as to investors. As Defendant Gordon explained at the end of the Relevant Time Period in MongoDB's May 30, 2024, earnings call, "[a]n unintended consequence of reducing friction is you actually have less information about everything." During the call, a Needham & Company analyst asked how MongoDB was refining its focus on acquiring the "right" workloads because, as he observed, "you

almost by default have less visibility into that customer because you have reduced the friction to adopt." In response, Defendant Gordon acknowledged the dramatic asymmetry in information attained when acquiring workloads in a "frictionless manner":

> I do think if you think about it this way, if you're going through the process of negotiating a commitment with a customer, you're going to get an enormous amount of information from that customer about the workload and about everything else. And so, when you're moving in a frictionless manner to get more workloads, you won't get all of that information.
>
> It's still possible with intent and purpose and incentives to get some of that information. And getting that little bit of relevant information is dramatically different than getting a commitment, right? And so, that's the balance that we're just, we're trying to strike and that we're continuing to iterate as we learn here.

42. Defendant Gordon further elaborated on the consequences of MongoDB's change to consumption pricing during the June 4, 2024 Baird Global Consumer, Technology & Services Conference (the "Baird Technology Conference"), admitting that "in reducing the commitment emphasis," sales representatives "missed some specific data about the application[s]" and were "over-rotated too much to volume" rather than quality given the lack of communication flow and consequential dearth of information gathered during the negotiation process. Defendant Gordon added at the June 5, 2024 William Blair Growth Stock Conference (the "Blair Growth Conference") that "if I'm not looking for a commitment, I'm going to lose a whole bunch of information or not have access to a whole bunch of information, not gain a whole bunch of information that [the customer] is going to disclose to me as we're going back and forth and negotiating," resulting in a lack of "a representative portfolio of growth."

43. The issue with the data's reliability is crucial because during the Relevant Time Period, the Company closely tracked workload-related consumption data in order to analyze the growth pattern of new Atlas workloads – the largest and most important source of the Company's revenue. Defendant Ittycheria commented during MongoDB's June 1, 2023, earnings call that

"[i]t's all about acquiring workloads, so our incentive mechanisms, management attention and focus is all about this North Star about acquiring new workloads."

44. In response to a question about how involved the CEO was in assessing the "core sales metrics" at MongoDB, Defendant Ittycheria explained that he met with his head of sales weekly to discuss forecasting and tracked various sales metrics, including productivity:

> Well honestly, the forecast is really important . . . In my weekly staff meeting, one of the first things on the agenda is our head of sales reviews the forecast for the current quarter and gives us [inaudible] after the first month to have some sense of visibility for the next quarter, so we want to have a little bit longer to review not just it's all about this quarter . . . In fact I think the most important – at the end of the day -- the most important, or the most salient metric for any organization . . . not just with sales but with the whole organization is sales productivity. . . No matter what function you play in the company, whether you're in marketing, and finance, engineering, and support, whatever you do or don't do either helps or hurts sales productivity. So it's a metric to really galvanize the whole organization. So it's not really just a measure of the sales organization, it's a measure of the performance of the business.

45. Defendant Ittycheria also stated that he tracked sales representatives' productivity "ramp times" and broad-based sales performance across the business (i.e., what percentage of representatives were hitting their quotas). During an October 2023 interview, Defendant Ittycheria reaffirmed his practice of "attending quarterly review sessions and QBRs or reviews to attend sales forecast reviews" during the Relevant Time Period.

46. Defendants Gordon and Tanjga also exhibited deep familiarity with MongoDB's consumption data and workload growth. In that vein, during the Company's earnings call on August 31, 2023, Defendant Gordon represented that:

> [W]e continually review and analyze product usage signals to determine the growth potential of our customers. Because we are focused on velocity and efficiency of new workload acquisition, we're very careful not to deploy our reps on accounts where we don't see significant incremental benefit from sales rep coverage.

47. Likewise, at a September 7, 2023, Citi Global Technology Conference, Defendant Tanjga confirmed that consumption data provided the Company with the ability to confidently

forecast workload growth, stating: "we have access to a tremendous amount of data, and we try to become more intelligent over time as we use that data and usage patterns to judge our customers' potential. And so -- and it's an ongoing process, but what we've particularly become more comfortable over time is our ability to call when we see that there's incremental workload potential in the account." Defendant Tanjga also stated that "real-time data is helpful because we can revisit [] decisions as we go along."

48. The Company ostensibly used that data to discuss with investors the quality of the workloads being acquired. On June 1, 2023, Defendant Ittycheria told investors that the Company's "go-to-market channels . . . are doing a really good job on qualifying these [new workload] opportunities" and that they were "able to separate customers who are serious versus customers who may be just wanting to kick the tires." Similarly, Defendant Ittycheria confirmed that the Company was in fact "acquiring high- quality workloads."

49. During the Company's August 31, 2023, earnings call, Defendant Ittycheria specifically claimed that the elimination of "incentiviz[ing] reps to sign customers to 1-year commitments" was positioning the Company "better for the longer term," and that "our efforts to reduce friction are resulting in more efficient growth." He also emphasized that the Company was "pleased with the impact these changes have had in the business in the first half of the year," and explained again in September 2023 that "we're really pleased by the velocity of workloads that we're acquiring" and "over the years, we should see that impact really show up." Defendant Gordon likewise expressed confidence in the Company's "more stable consumption," and "stronger" week-over-week consumption growth. Defendants made these statements despite knowing that new customer workloads acquired in FY 2024 were decelerating or even decreasing.

50. Worse still, Defendant Tanjga actively deflected any concerns about the switch to

consumption pricing when asked directly by an analyst in January 2024 about what he learned from the "big" change to the sales organization in 2023. Defendant Tanjga dismissed concerns that such changes may have had a negative impact on the Company's long-term growth: "But as you think about like what does that mean in terms of compares or mechanics of the financial model for next year, nothing particular to call out."

**B. MongoDB's False and Misleading Statements**

51. From at least June 1, 2023, through May 30, 2024, MongoDB and its executive officers made materially false and misleading statements regarding the Company's workloads and consumption rates.

52. On June 1, 2023, the Company held a conference call for investors and analysts to discuss the recently released financial results for the first quarter of fiscal year 2024. During that call, Defendant Ittycheria stated:

> So I would also say that our go-to-market channels have to really focus on and are doing a really good job on qualifying these opportunities, being able to separate customers who are serious versus customers who may be just wanting to kick the tires. And again, as I mentioned earlier, it's all about us acquiring high-quality workloads. If we can [] acquire high-quality workloads, onboard them well and make sure they're serviced as well, good things will happen, and that's happening.

53. On August 31, 2023, MongoDB held a call for stockholders and analysts to discuss second quarter fiscal year 2024 results. During his opening remarks, Defendant Ittycheria discussed details of the Company's new sales incentive plan:

> Historically, the most significant source of friction has been negotiating with customers to secure an upfront Atlas commitment since it can be hard for customers to forecast consumption growth for a new workload. Given our high retention rates and the underlying consumption growth, several years ago, we began reducing the importance of upfront commitments in our go-to-market process to accelerate workload acquisition. This year, we took additional steps in that direction.
>
> For example, we no longer incentivize reps to sign customers to 1-year commitments. Obviously, this has short-term impact on our cash flow, but positions us better for the longer term by accelerating workload acquisition. We are pleased

> with the impact these changes have had in the business in the first half of the year. Specifically, new workload acquisition has accelerated, especially within existing customers. We believe that our efforts to reduce friction are resulting in more efficient growth, and we'll always look for ways to improve our go-to-market approach to make it even easier for customers to bring new workloads onto our platform.

54. Defendant Gordon further detailed the impact of this change on MongoDB's projected growth, emphasizing overall increases in revenue despite the decline in upfront revenue from the Atlas product:

> Finally, as Dev mentioned, we continue deemphasizing the value of upfront commitments. So we're seeing fewer of them. In other words, we are intentionally collecting less cash upfront in order to win more workloads more quickly. As evidence of this, we grew Atlas revenue 38% year-over-year, while Atlas dollars committed upfront actually declined 15% year-over-year.
>
> Lower upfront commitments only impact the timing of when our customers pay us, not the total payment. But this trend of declining upfront commitments will impact the relationship between our non-GAAP operating income and operating cash flow in the medium term.
>
> I'll provide some more context on our guidance. First, we have modestly raised our Atlas outlook for the rest of the year, primarily to reflect a slightly stronger Q2 and therefore, a higher starting ARR for the second half. We continue to expect that Atlas consumption growth will be impacted by the difficult macroeconomic environment throughout fiscal '24.
>
> * * *
>
> Second, we expect to see a significant sequential decline in non-Atlas revenues in Q3 as we simply don't expect similar new business activity, especially when it comes to licensing deals. For that particular line of business, Q2 was extreme positive outlier.

55. During the question-and-answer portion of the call, Defendant Gordon continued to downplay the concerns about the transition to consumption pricing:

> <Q: Keith Weiss - Morgan Stanley - Analyst>… And then the question for Michael. You talked about the commitments coming down, the Atlas commitments coming down and that being a drag on operating cash flow. Any sense you could give us on how long that drag on OCF persists? Is there any way to size that impact over time?

<A: Michael Lawrence Gordon> And on your other question, Keith, it's been a multiyear journey where we've been focused on reducing friction and accelerating new workload adoption. I do think as we called out, we continue to make additional steps and Dev called out some of the specific incremental steps this year. I think it's part of a transition. If you look at the Atlas revenue growth, Atlas grew 38% year-over-year, but dollars collected upfront shrank 15%, right? And so that gives you a sense for the magnitude or the divergence there that's showing up in the op income versus OCF bridge. I think like most things, there'll be a transition time period, but then it will settle into a more normalized level, but we think we've still got like a little bit more transition to go as we kind of work through the balance of the year.

* * *

<Q: Brad Robert Reback - Stifel, Nicolaus & Company, Inc. - MD & Senior Equity Research Analyst> I'm not sure Dev or Michael, but going back to the commentary on fewer upfront Atlas commits. Oftentimes, when customers sign multiyear deals and pay upfront, they get a better rate. So if we were to think about not having them pay you upfront and make long-term commits, is that a net margin benefit to you guys on the pricing side?

<A: Michael Lawrence Gordon> Yes. So a couple of things. Thanks Brad for the question. In general, for us, even before the sort of evolution and changes in multiyear deals, typically, they were not all paid upfront. Typically, ours has been annually billed. But yes, to your point, I think as we've reduced upfront commitment, you have a couple of dynamics. The key one is when we are not motivating it or providing an incentive to our sales force, and wind up being customer driven, the leverage in that negotiation shifts. And on the margin, that is helpful for ultimate pricing or discount and it winds up with sort of better pricing for us, less discounting to the customer.

56. On December 5, 2023, the Company issued a press release announcing financial results for the third quarter of fiscal year 2024. During a call for analysts and investors later that same day, Defendant Ittycheria touted the ongoing success of both MongoDB's EA and Atlas growth, noting EA again exceeding expectations and an increase in Atlas clients due to the shift in sales strategy:

We had a healthy quarter of new business acquisition led by continued strength in new workload acquisition within our existing customers. In addition, our Enterprise Advanced business again exceeded our expectations demonstrating strong demand for our platform and the appeal of our run anywhere strategy.

> Moving on to Atlas consumption trends. The quarter played out in line with our expectations . . . This quarter, we held our most recent global Customer Advisory Board meeting, where customers across various geographies and industries came together to share feedback and insight about the experience using MongoDB. From these discussions as well as our ongoing C-suite dialogue with our customers, a few themes emerge.

57. Defendant Gordon also touted the Company's success in his opening remarks:

> Shifting to our product mix. Let's start with Atlas. Atlas grew 36% in the quarter compared to the previous year and represents 66% of total revenue compared to 63% in the third fiscal 2023 and 63% last quarter. As a reminder, we recognize Atlas revenue primarily based on customer consumption of our platform and that consumption is closely related to end-user activity of the application, which can be impacted by macroeconomic factors.
>
> Let me provide some context on Atlas consumption in the quarter. Week-over-week consumption growth in Q3 was in line with our expectations and stronger than Q2. As a reminder, we were expecting an uptick in consumption in Q3 compared to Q2 based on what we've experienced and shared with you last year. We had forecast that seasonal improvement to be less pronounced this year compared to last year given that, overall, we've seen less consumption variability this year and that is exactly how the quarter played out.
>
> * * *
>
> Turning to non-Atlas revenues. EA exceeded our expectations in the quarter as we continue to have success selling incremental workloads into our existing EA customer base. Ongoing EA strength speaks to the appeal and the success of our run anywhere strategy. The EA revenue up was in part a result of more multiyear deals than we had expected. . . . Turning to customer growth. During the third quarter, we grew our customer base by approximately 1,400 customers sequentially, bringing our total customer count to over 46,400, which is up from over 39,100 in the year ago period. Of our total customer count, over 6,900 are direct sales customers, which compares to over 5,900 in the year ago period. The growth in our total customer count is being driven primarily by Atlas, which had over 44,900 customers at the end of the quarter compared to over 37,600 customers in the year ago period. It is important to keep in mind that the growth in our Atlas customer count reflects new customers to MongoDB in addition to existing EA customers adding incremental Atlas workloads.

58. Defendant Gordon then provided guidance for the remainder of fiscal year 2024:

> For the full fiscal 2024, we are increasing our outlook across the board. We now expect revenue to be in the range of $1.654 billion to $1.658 billion.

* * *

> I'll now provide some context on our guidance. First, we expect Q4 Atlas consumption growth to be impacted by the seasonal slowdown around the holidays. Second, as you think about both sequential and year-over-year revenue growth of Atlas in Q4, keep in mind that in Q4 last year, we had several million dollars more of revenue coming from unused commitments, which we do not expect to occur this quarter. Third, as a result of our strong execution so far this year, we are again raising our non-Atlas revenue expectations for Q4. However, we expect that our non-Atlas revenues will decline sequentially Q4 versus Q3. This is different from our normal pattern as we usually see a seasonal uptick in Q4 due to greater renewal activity.

59. During the question-and-answer portion of the call, Defendants Ittycheria and Gordon were asked about the Company's growth with EA, the impact of the shift in sale strategy for Atlas, and expectations for fiscal year 2025:

> <Q: Raimo Lenschow - Barclays Bank PLC - Analyst> Congrats from me as well. I wanted to ask on EA first. Another very strong quarter there. Can you talk a little bit more on the drivers there? Because I do seem to remember you kind of doubled down on sales capacity. I think it was junior sales guys that you wanted to put on existing accounts. Is that kind of the main driver?
>
> Or is it more like modernization are kind of picking up a lot more than what we thought would be possible? Can you speak to that because it's like the second quarter in a row where we kind of have better numbers there? And then I have one follow-up for Michael.
>
> <A: Dev C. Ittycheria> Yes. So Raimo, with regards to our EA outperformance, I think it really speaks to our run anywhere strategy, where customers really value the ability to build on MongoDB and for essentially future-proof their deployment model, whether they stay on-prem also move to the cloud or move from one cloud to another cloud. And the fact that they can do that without having to rewrite the application is very compelling for customers.
>
> As you also said, a lot of customers still -- especially the largest customers still have a lot of sunk cost and they want to leverage their existing data infrastructure. So a lot of customers have told us that they will still deploy infrastructure on-prem for the foreseeable future. But what -- by building on MongoDB, they get the benefits of a modern platform and the optionality to also remove the cloud when they're ready to do so.

<A: Michael Lawrence Gordon> Yes. The other thing, I know you know, Raimo, but just for the broader audience, we run the business on a channel basis, sales isn't oriented around products. And then also, as we've said before, EA tends to be -- the additional sales of EA tend to be to existing customers. We don't tend to have a ton of new -- brand new customers on EA. . . .

* * *

<Q: Karl Emil Keirstead - UBS Investment Bank, Analyst> . . . Mike, you had talked on the last call a little bit more about this mix shift away from multiyear Atlas commits. And you were pointing to that as a reason for some of your metrics like DR and I think even cash flow to come under a little pressure. This quarter, I see DR is still under pressure. Cash flow was a little bit better. Can you maybe revisit that phenomenon and describe how it's impacting some of these metrics?

<A: Michael Lawrence Gordon> Yes, a couple of things. As we've said from the beginning, some of those like calculated billings or deferred revenue metrics aren't super helpful or don't provide a ton of insight in terms of how we run the business. We've also talked about how -- over the last couple of years, one of the things we've been trying to do is reduce friction for the sales force. Some of that includes reducing the emphasis around upfront commitments.

And so that helps accelerate landing new workloads and things like that, and that will flow through or does flow through the financial statements as less upfront deferred and things like that. And so it allows us to sort of synthetically cover more ground from a sales force perspective. And so you do see that continuing to go through. We shared the stat, the statistic last quarter. The Atlas revenue growth last quarter was 38%, but dollars of committed Atlas declined 15% year-over-year, just as one way to try and help dimensionalize it.

We also talked, I think, earlier in the year about how roughly 80% of Atlas doesn't flow through deferred. And so I think all of those data points help kind of line up to explain the rest of what you're seeing and why that's not sort of a helpful forwardlooking metric like it might be in other companies. It doesn't kind of give you the insight that maybe people are used to or hope that, that will provide.

* * *

<Q: Kasthuri Gopalan Rangan - Goldman Sachs Group Inc - Head of Software Coverage> Dev and Michael, happy holidays, congrats on the results. So going into calendar '24, how does the management team feel relative to going in to come to '23 with respect to how macro conditions are no longer impacting or maybe they are impacting some aspects of the business? Any verticals that stand out that you feel particularly excited about? So just wanted to understand how MongoDB is therefore fitting into customer priorities as you get into 2024?

> <A: Dev C. Ittycheria> Hi, Kash, thanks for the question. I think compared from last year, this year, we don't see things getting worse, but we don't see things getting better. Where I'd say last year with the Fed raising rates, you could really sense that people are getting much more cautious. And it was -- there was probably more negativity in terms of the outlook coming into calendar 2023.
>
> So that being said, we definitely see innovation being a priority for customers. We clearly are, I would say, in the distinction between must-have and nice-to-have clearly in the first category. But customers also, as I mentioned in the prepared remarks, we remain focused on being sensitive to costs and ensuring that any investments, they may have a high ROI.
>
> So we feel that we're well-positioned in terms of use cases or segments. I would say, in general, there's no real kind of material change in any -- across any vertical industry or geography. We do see -- I mean we were at re:Invent last week, and we had an amazing set of conversations with lots of senior level customers. I think we're really viewed as a mission-critical platform by all our customers. And I think people view us as a platform that they can bet on long term.
>
> And so we see less, I would say, focus on like point solutions and more about like trying to leverage MongoDB for more and more use cases. And I would say that, that's pretty consistent across industries and geographies
>
> <A: Michael Lawrence Gordon> Yes. The only other thing I'd add, Kash, is clearly, things have stabilized. We are not guiding fiscal '25. But just looking out, there's clearly a difficult EA and non-EA compare that people should sort of keep in mind. And I think the big assumption or the big determiner will be people's macro outlook in terms of how that affects the fiscal '25 numbers. But those are probably the key things to keep in mind.

60. On January 16, 2024, the Individual Defendants participated in the Needham Growth Conference. During the conference, Tanjga responded to a question from Needham & Company Senior Analyst Michael Cikos about the "big change" to the sales organization the previous year and whether "there [are] any learnings" to keep in mind in terms of revenue, consumption, new workloads, or sales payouts. As reflected in the following exchange, Tanjga denied any negative impact from the Company's go-to-market sales compensation plan and instead misleadingly highlighted the "volume of new workloads . . . and how good we feel about that," as reflected in the following exchange:

<Q: Michael Joseph Cikos Needham & Company, LLC, Research Division - Senior Analyst> Understood. And just last point here, and then we'll leave it. But is it fair to think, given -- I know you've been on a multiyear journey with this, but last year was a big change, right, for the sales organization. So are there any learnings or anything we should keep in mind, again, when thinking about comparisons, whether on a revenue consumption basis and then new workloads or sales payout that occurred last year, which may not be recurring this year?

<A: Serge Tanjga> No, not really. I would say that we've -- because it wasn't our first change, we've learned a decent amount about change management and how to implement this and roll this out in fiscal year '24. And that's frankly the reason why you do it over multiple years. You do it to build conviction that you're doing the right thing, but you're also doing it to like demonstrate to the sales force, like why you're doing it, and there's a rationale for this. And so -- and it wasn't actually terribly disruptive, given the size of the change that it was not in terms of sales attrition or anything like that.

So it was a big change. You see it flow through the financials. We also see it on the volume of new workloads, which is where we started the conversation and how good we feel about that. But as you think about like what does that mean in terms of compares or mechanics of the financial model for next year, nothing particular to call out.

61. On March 7, 2024, MongoDB issued a press release announcing financial results for the fourth quarter and fiscal year 2024 results. The press release also included guidance for the following fiscal year. The press release stated:

**Full Year Fiscal 2024 Financial Highlights**

● Revenue: Total revenue was $1.68 billion for the full year fiscal 2024, an increase of 31% year-over-year. Subscription revenue was $1.63 billion, an increase of 32% year-over-year, and services revenue was $55.7 million, an increase of 14% year-over-year.

● Gross Profit: Gross profit was $1.26 billion for the full year fiscal 2024, representing a 75% gross margin compared to 73% in the year-ago period. NonGAAP gross profit was $1.30 billion, representing a 77% non-GAAP gross margin, compared to a non-GAAP gross margin of 75% in the year-ago period.

● Loss from Operations: Loss from operations was $233.7 million for the full year fiscal 2024, compared to a loss from operations of $346.7 million in the yearago period. Non-GAAP income from operations was $270.4 million, compared to a non-GAAP income from operations of $62.0 million in the year-ago period.

● Net Loss: Net loss was $176.6 million, or $2.48 per share, based on 71.2 million weighted-average shares outstanding, for the full year fiscal 2024. This compares to a net loss of $345.4 million, or $5.03 per share in the year-ago period. Non-GAAP net income was $274.2 million or $3.33 per share based on 82.4 million diluted weighted-average shares outstanding. This compares to a non-GAAP net income of $64.7 million or $0.81 per share in the year-ago period.

● Cash Flow: During the year ended January 31, 2024, MongoDB generated $121.5 million of cash from operations, compared to $13.0 million of cash used in operations in the year-ago period. Free cash flow for the year ended January 31, 2024 was $109.9 million, compared to negative free cash flow of $24.7 million in the year-ago period.

First Quarter and Full Year Fiscal 2025 Guidance

Based on information available to management as of today, March 7, 2024, MongoDB is issuing the following financial guidance for the first quarter and full year fiscal 2025. guidance reflects the impact of over $80 million of FY24 revenue, related to multi-year term licenses and unused Atlas commitments, that we do not expect to realize in FY25.

| | **First Quarter Fiscal 2025** | **Full Year Fiscal 2025** |
|---|---|---|
| **Revenue** | $436.0 million to $440.0 million | $1.90 billion to $1.93 billion |
| **Non-GAAP Income from Operations** | $22.0 million to $25.0 million | $186.0 million to $201.0 million |
| **Non-GAAP Net Income per Share** | $0.34 to $0.39 | $2.27 to $2.49 |

62. The Company held a call for analysts and investors later that same day. During the call, Defendant Ittycheria focused on the prior fiscal year's results in his opening remarks:

Second, I see stable consumption growth going to next year. Atlas consumption trends have been steady for several quarters now and we experienced less consumption variability in fiscal '24 compared to fiscal '23. Ultimately, the main driver of Atlas consumption is the growth in the underlying application usage, and we see stable growth -- stable usage growth across our portfolio of workloads.

63. Defendant Gordon stated in his opening remarks:

Let's start with Atlas. Atlas grew 34% in the quarter compared to the previous year and now represents 68% of total revenue, compared to 65% in the fourth quarter of fiscal 2023 and 66% last quarter. We recognize Atlas revenue primarily based on customer consumption of our platform, and that consumption is closely related to end-user activity of the application

* * *

Turning to customer growth. During the fourth quarter, we grew our customer base by approximately 1,400 customers sequentially, bringing our total customer count to over 47,800 which is up from over 40,800 in the year ago period. Of our total customer count, over 7,000 are direct sales customers which compares to over 6,400 in the year ago period. The growth in our total customer count is being driven primarily by Atlas, which had over 46,300 customers at the end of the quarter, compared to over 39,300 in the year ago period. It's important to keep in mind that the growth of our Atlas customer count reflects new customers to MongoDB in addition to existing EA customers adding incremental Atlas workloads.

64. Defendant Gordon then remarked on the provided guidance for fiscal year 2025:

I'll now provide some more context on our guidance, starting with the full year fiscal '25 where we're facing difficult compares in 2 ways. First, we expect to recognize close to 0 revenue from unused Atlas commitments in fiscal '25 compared to over $40 million in fiscal '24. As you may recall, in fiscal '24, we changed our sales incentive structure to reduce the importance of upfront commitments, and so we saw far fewer upfront commitments. Therefore, as those fiscal '24 deals come up for renewal in fiscal '25, we expect to see limited revenue related to unused commitments.

Second, in fiscal '24, we recognized approximately $40 million more in multiyear license revenue than we did in fiscal '23. As you know, our fiscal year '24 non-Atlas revenue benefited from a higher than-usual amount of license revenue related to pay year contracts, including our extended partnership with Alibaba. Clearly, we are pleased with the fiscal '24 performance, but it was unusual in terms of the magnitude of multiyear deals and we don't expect similar performance in fiscal '25. As a result, we expect non-Atlas revenues to be modestly down in fiscal '25. Next, we expect Atlas consumption growth to be in line with the consumption growth we've experienced in fiscal '24.

* * *

Moving on to our Q1 guidance, a few things to keep in mind. First, we expect Atlas revenue to be flat to slightly down sequentially. Q1 has 2 fewer days than Q4 this

year, which represents a revenue headwind. Also the slower Atlas consumption growth during the holidays will have a bigger impact on Q1 revenue than it did in Q4, thereby negatively impacting sequential revenue growth. Finally, the sequential impact from the expected decline in unused Atlas commitments will be most pronounced in Q1, given that we made the changes in Q1 of last year.

Second, we expect to see a meaningful sequential decline in EA revenue. As discussed in past years, Q4 is our seasonally highest quarter in terms of our EA renewal base which is an excellent indicator of our ability to win new EA business. In Q1, the EA renewal base is sequentially much lower.

Finally, we expect operating income to decline sequentially due to lower revenue as well as our increased pace of hiring.

* * *

Atlas looks consistent from a consumption growth standpoint. And that's in line with the stable trends we've seen over the course of fiscal '24, so we're using those fiscal '24 numbers.

65. During the question-and-answer portion of the call, Defendants Ittycheria and Gordon were asked at length about the Company's projections:

<Q: Raimo Lenschow - Barclays Bank PLC - Analyst> Congrats on a nice Q4. A question also a little bit on guidance. Mike, the last few quarters before Q4, we talked about EA seeing a little bit of a tailwind from customers kind of maybe modernizing on premise rather than doing to Atlas to kind of still modernize but maybe not spending all the money to go to the cloud. Is that trend still valid? And if you think about the multiyear commitments, obviously, you had, what, 10 million, 15 million for the Alibaba deal. But then the other stuff is like customers that are just doing this work. Do you think that will change and people go back to like shorter commitments? Or is it just more that you're kind of thinking about the renewal pool.

<A: Michael Lawrence Gordon> Yes. So a few different things embedded in there. On the multiyear, we've -- it's always been a dynamic. And as we've seen deals or variability, we've tried to call that out and that's why we sort of call out, given under the ASC 606 that increased variability and reduced comparability that comes from EA. Obviously, Atlas has grown as a percentage of the business, but that continues to be the dynamic for the EA portion. I expect that we will continue to see multiyear deals, but we just -- in fiscal '24, it was just so many more than we thought. And to your point, not just EA, but broadly nonAtlas. And it's just -- it's not something that will repeat in fiscal '25. And so that's why we wanted to call it out and quantified it.

* * *

<Q: Kasthuri Gopalan Rangan - Goldman Sachs Group, Inc. - Head of Software Coverage> Congrats on the results. One quick one for Dev and one hopefully will go to Michael as well . . . One for Michael. In your assumptions, when I take away the $40 million of the upfront, I mean, that's like a couple of percentage points of growth. I'm just trying to understand what kind of consumption trends you are using to build guidance? Was it average of fiscal '24 consumption trends or weighted more towards second half or exiting fourth quarter? Any color there would be tremendously useful.

* * *

<A: Michael Lawrence Gordon> And then on the consumption questions, Kash, thanks for that. Overall, if you look at the guidance and the piece parts that we've tried to share with you, when you take into account the $80 million of impact from the unused commitments and the multiyear outperformance, you'll see at the top line level around 500 basis points of a headwind. And then we also walked you through our expectations that the non-Atlas will be modestly down, given the $40 million of that part that isn't recurring. So when you kind of piece all those together, you'll wind up probably coming to a conclusion that Atlas looks consistent from a consumption growth standpoint. And that's in line with the stable trends we've seen over the course of fiscal '24, so we're using those fiscal '24 numbers. (Emphasis added.)

Obviously, there's some seasonal adjustments that we have factored in there, but that's really what we're seeing there.

* * *

<Q: Bradley Hartwell Sills - BofA Securities - Director, Analyst> I wanted to ask a question around the sales capacity. It sounds like at some point last year, you realized that you had underinvested, maybe pivoted too much towards margin expansion and then are now catching up. In the guidance, if you could assume you had the sales capacity that you would prefer to be at this point given the demand that you're seeing, would we be at a higher level of growth? I'm just trying to parse out how much of the guide is factoring in those constraints on sales capacity that you've talked about. (Emphasis added.)

<A: Dev C. Ittycheria> Yes. So thanks for your question. Yes, given the macro uncertainty, especially coming out off Q4 of last year, we did slow down hiring quite meaningfully. And obviously, that showed up in our numbers, to the point that Michael talked about in our op margin as well. We obviously know that we have a big opportunity in front of us. So we are growing our head count between the mid- and high teens. We think that's appropriate relative to the opportunities

we see. And yes, if we had more productive sales capacity, the guidance would probably be higher. There's no question about that.

66. Defendant Ittycheria also commented on the reasons behind the provided guidance for fiscal year 2025:

In summary, we expect the environment in fiscal '25 to be largely similar to the environment we experienced in fiscal '24.

* * *

[W]e are focused on growing sales capacity. As we told you in the past, we are slow to grow capacity in fiscal '24, especially in the first half due to macro uncertainty. Given that the market is more stable now and that we remain underpenetrated compared to our opportunity, we'll increase the pace of go-to-market investments in fiscal '25.

* * *

Let me wrap up by saying that I remain highly confident about our ability to execute on our long-term growth opportunity. We are pursuing one of the largest and fastest-growing markets in all of software, with significant expansion opportunities in both new and existing customer accounts. While it's early days, we expect that AI will not only support the overall growth of the market, but also compel customers to revisit both their legacy workloads and build more ambitious applications. This will allow us to win more new and existing workloads and to ultimately contribute to establish MongoDB as a standard in enterprise accounts.

67. Defendant Gordon also attempted to explain away the provided guidance for fiscal year 2025:

I'll now provide some more context on our guidance, starting with the full year fiscal '25 where we're facing difficult compares in 2 ways. First, we expect to recognize close to 0 revenue from unused Atlas commitments in fiscal '25 compared to over $40 million in fiscal '24. As you may recall, in fiscal '24, we changed our sales incentive structure to reduce the importance of upfront commitments, and so we saw far fewer upfront commitments.

Therefore, as those fiscal '24 deals come up for renewal in fiscal '25, we expect to see limited revenue related to unused commitments.

Second, in fiscal '24, we recognized approximately $40 million more in multiyear license revenue than we did in fiscal '23. As you know, our fiscal year '24 non-Atlas revenue benefited from a higher-than-usual amount of license revenue related

to pay year contracts, including our extended partnership with Alibaba. Clearly, we are pleased with the fiscal '24 performance, but it was unusual in terms of the magnitude of multiyear deals and we don't expect similar performance in fiscal '25.

As a result, we expect non-Atlas revenues to be modestly down in fiscal '25. Next, we expect Atlas consumption growth to be in line with the consumption growth we've experienced in fiscal '24.

68. When questioned about whether the Company expected fiscal year 2025 to be like the previous year, where the projected financial results were less than the actual financial results, Defendant Gordon stated:

<Q: Brent Alan Bracelin - Piper Sandler & Co. - MD & Senior Research Analyst> Michael, we're going to stick with the guide seen here. If I look at last year, you guided to, I think, 16% growth. You ended up doing 31% for the full year. Even if I take out the $80 million tailwind, you talked about, that's still 25% growth. You're guiding to 14% growth this year, again 5% headwind, so closer to 19% organically.

Are you more confident kind of going into this year than last year just as you think about the trends? Is the 14% comparable to the 16% initial guide last year? Is it really more like 19% adjusted basis comparing to 16%? I know it's a little confusing, but getting a lot of questions on it.

<A: Michael Lawrence Gordon> Yes. No, it's fine. I go back to what I said in response, I think it was to Sanjeet's question. There's been no fundamental change or approach in terms of how we're looking and determining our guidance. I do think to the confidence point, I think that, that is correct. We do have more confidence. We have more data. We -- if you think back a year ago, as one of the questions indicated, there was much more macro uncertainty. I think over the course of fiscal '24, we saw narrower variability. We saw more consistent results that does give us increased confidence. I think we also have another year under our belt in terms of understanding the seasonality trends of Atlas.

I know Atlas is a big business, but it's still a relatively young one, especially when you think about giving quarterly data points. And so I think we have more confidence and better handle on that. And then lastly, while there is a difficult compare on EA -- I think we talked about this in the second half of last year where we were -- at some point, you could only be -- continue to be surprised by EA so much. And so as we looked at our – I think it was in our third quarter call, we talked about how we were upping our views on what EA could do. And so all that's sort of baked into the guide.

69. Investors and analysts reacted negatively to the updated guidance. The Company's stock price dropped from a close of $412.01 per share on March 7, 2024, to a close of $383.42 per share on March 8, 2024.

70. On May 2, 2024, the Individual Defendants hosted a Keynote Session at MongoDB.local NYC. Gordon represented to investors that the Company's acquisition of new workloads were contributing to stable growth in fiscal 2024:

> And as we've said before, those new workloads grow more quickly initially. So what you can see here is if we add in the green, you'll see the impact of new workloads that we add in the first 4 quarters, right? So this is just an 8-quarter view. And what you can see is as you add in those first workloads, they sort of are accretive to growth, right? They're adding to the growth rate. And then subsequently, the blue lines, which I'll sort of fill in here are the impact of new workloads that you add in quarters 5 through 8.
>
> And so in aggregate, again, we're ignoring seasonality, this is sort of illustrative. But what you can see here is the result of the stable growth is a result of a mix of workloads, existing workloads, new workloads and everything else. And so theoretically, if you take that kind of theoretical construct, and you apply it practically, what that meant in fiscal '24 was the workloads that we acquired during the year in addition to those that we acquired in the year before, just to keep this 8-quarter view consistent, contributed to the stable growth that we saw in fiscal '24 relative to fiscal '23.

71. The foregoing statements were materially false and misleading, failing to disclose materially adverse facts about the Company's business and operations. Specifically, the Defendants led stockholders to believe that they possessed reliable information about the growth in workloads and consumption rates. Defendants failed to disclose that consumption rates were decelerating or even decreasing, as the acquisition of new workloads did not correspond to growth in consumption.

## C. The Truth is Revealed

72. In the evening of May 30, 2024, MongoDB issued a press release announcing the financial results for the first quarter of fiscal year 2025. The press release included the following update on projections for the remainder of fiscal year 2025:

> **Second Quarter and Full Year Fiscal 2025 Guidance**
>
> Based on information available to management as of today, May 30, 2024, MongoDB is issuing the following financial guidance for the second quarter and full year fiscal 2025.

| | **Second Quarter Fiscal 2025** | **Full Year Fiscal 2025** |
|---|---|---|
| **Revenue** | $460.0 million to $464.0 million | $1.88 billion to $1.90 billion |
| **Non-GAAP Income from Operations** | $35.0 million to $38.0 million | $168.0 million to $183.0 million |
| **Non-GAAP Net Income per Share** | $0.46 to $0.49 | $2.15 to $2.30 |

73. That same day, the Company held a call for investors and analysts. Defendant Ittycheria stated the following in his opening remarks:

> Let me go into our quarterly results in a bit more detail. First, Atlas consumption growth was below our expectations in the first quarter. We saw less seasonal improvement than expected, and this dynamic was true with customers across tenure, industry, size and geography. We believe this indicates a more challenging macro environment than expected at the beginning of the year.
>
> A new dynamic we saw in Q1 was the growth rate of more recently acquired workloads started to slow down earlier than expected. While the macro environment had an impact, we also believe this is partly due to the go-to-market changes we instituted last year. We have fine-tuned our process and incentive

structures to make sure the field is focused on winning workloads with higher growth potential.

Second, our new business performance in Q1 wasn't up to our standards. Operationally, we got off to a slow start in the quarter. And while we mostly caught up on new business as the quarter went on, we didn't quite get there in the end.

74. Defendant Gordon stated in his opening remarks:

[A]s we communicated last quarter, Q1 was the first quarter we saw the expected significant decline in revenue from unused Atlas commitments, making this quarter a tough comparison, both sequentially and year-over-year.

75. Defendant Gordon then explained the reduced guidance for the remainder of fiscal year 2025:

I'll now provide some more context around our guidance, starting with the full year. First, as a reminder, our fiscal '25 Atlas revenue growth rate will be impacted by the absence of over $40 million in revenue related to unused customer commitments.

Second, we had expected Atlas consumption growth to be stable in fiscal '25 relative to fiscal '24. But after a weaker-than-expected Q1, we now expect Atlas consumption growth to slow down this year. The slowdown is driven by the more pronounced macro impact we are seeing on our existing workloads, recent cohorts in particular. In addition, starting Q2 Atlas ARR is also lower in part because of the smaller-than-expected new business cohort in Q1.

Third, we previously expected non-Atlas revenues to be modestly down in fiscal '25. As a reminder, in fiscal '24, we recognized approximately $40 million more in multiyear license revenue than we did in fiscal '23, making for a difficult compare this year. We had expected fiscal '25 multiyear license revenue contribution to be more in line with fiscal '23. However, in Q1, despite the EA outperformance, we saw a lower-than-expected contribution from multiyear deals, and our a pipeline of multiyear deals for the rest of the year is currently lower given the macro environment. Consequently, we now expect non-Atlas revenue to be down mid-single digits for the year.

76. The analysts attending the call questioned the rationale for the updated guidance and the disclosed financial results:

<Q: Sanjit Kumar Singh - Morgan Stanley - Vice President> Understood. And then just one quick follow-up on the sales side. You mentioned that sort of the recently acquired workloads were not growing as fast as expected, and you seem to point

that as related to some sales execution opportunities. Could you unpack that for us as to like why that may be an issue? Once the customer sort of onboards the new workload, what's the sort of responsibility of sales to grow that? I would imagine that once you stand up that work case, it's sort of driven by the nature of the application. So I just want to understand the new workload that can [indiscernible].

<A: Dev C. Ittycheria> Yes, I just want to -- I think there's actually 2 separate issues. One is we're talking -- when we talk about workloads slowing down or growing more slowly, we're talking about the workloads predominantly from last year and before. We had a record workload volume last year, and we purposely designed our incentive system to reduce the friction to acquire workloads, and that actually worked really well.

What we're seeing is that now as we're starting to hit the 1-year mark for the first workloads required last Q1 that they're growing more slowly. So we're changing and finetuning some of the incentives to ensure that our salespeople and our teams focus on higher quality workloads that have higher growth potential. That's -- so that's one point. In terms of new business, we did have a slow start to the year.

As you know, we really focused on acquiring new workloads and measuring workloads all last year, so it took some time for us to analyze that workload data and that then delayed how we organize from an org structure or territory and ultimately finalizing quotas. And so we did almost catch up by the end of the quarter but not fully. But I want to be clear, we remain very confident in our ability to win new business, and our win rates remain strong.

77. The following exchange between Ittycheria, Gordon, and Stifel Nicolaus analyst Brad Reback provided further insight into how MongoDB's focus on volume over quality resulted in a lack of information and data that sales representatives collected:

<Q: Brad Robert Reback - Stifel, Nicolaus & Company, Inc. - MD & Senior Equity Research Analyst> Great. And on the volume versus potential of deals, we'll say, or workloads, as you talked about last year, a lot of volume, maybe the potential wasn't as high to -- for those workloads to grow. Can you give us a sense of the types of workloads that weren't growing as fast? Or what gives you confidence that you've really identified those types of workloads that can get you back to high potential?

<A: Dev C. Ittycheria> Yes. I mean the initial workloads actually grew in line with what we were expecting, but then they started growing more slowly. And we really noticed this quarter. I would say, while it's not easy to identify, especially new workloads, what's going to take off versus what's going to be more of a slower growth workload because sometimes even customers don't know, what we have done is changed incentive systems a bit to emphasize more quality of workloads in

the sales comp plans. So by definition, they're very incentivized to really push for the higher-growth workloads, and they can get -- not perfect data but a lot better data by working more closely with customers to understand which are more of the critical workloads versus more of the tertiary workloads.

<A: Michael Lawrence Gordon> And maybe, Brad, just to sort of connect the dots just to make sure that everyone's following is that as we successfully got more volume, right, because we've got low share in this big market, one of the things that we did that helped us do that is reduce friction upfront. An unintended consequence of reducing friction is you actually have less information about everything, right? So if you're a sales rep and you're trying to prioritize your time, that was an unintended consequence. So what Dev is talking about will help address that.

78. Ittycheria and Gordon continued to field questions about the quality and growth of the FY 2024 workloads. In the following exchange with senior analyst Mike Cikos of Needham & Company LLC, Ittycheria agreed that Defendants "[p]otentially" "over-indexed toward focusing on the volume of these newly acquired workloads over quality," and explained that in response, the Company had now "devote[d] more resources to the enterprise segment of the market" in order to refocus on acquiring quality workloads. Gordon admitted that the Company's efforts to reduce friction resulted in foregoing "an enormous amount of information" from customers during the negotiation process, which he described as "dramatically different than getting a commitment":

<Q: Michael Joseph Cikos - Needham & Company, LLC - Senior Analyst> I have 2, and I'll start with the first 1 here just to be clear, but I want to make sure I'm interpreting this properly. On the slower growth from those newly acquired workloads last year, is the takeaway that the sales team wasn't necessarily acquiring the "right type of workload" because MongoDB, it sounds like it is over-indexed toward focusing on the volume of these newly acquired workloads over quality. Is that a fair characterization or takeaway from what we're hearing today?

<A: Dev C. Ittycheria> Potentially. I mean I would say that we obviously have learned a lot. And so we really indexed on volume because, as in past years, when you have a portfolio of workloads, you're not sure which workload is going to take off, and that's been the growth driver of our business. And I'll just remind you, 5 years ago, we were 1/10 of the size of our business today, so that's -- our strategy has been to acquire workloads as quickly as possible, and we want to be -- make it even easier for customers to -- for us to win workloads, so customers could use our platform. It's just that as we see the growth rates of the workloads that are more recently acquired, they seem to be growing a little slower than we expected.

> And so we're just making some refinements. I don't want to suggest that this is a major pivot or kind of change in direction. It's just some major -- some refinements in terms of our incentive system to reward salespeople for workloads that grow even -- that grow fast. And so -- and that's -- we think that's the appropriate response here.
>
> <Q: Michael Joseph Cikos - Needham & Company, LLC - Senior Analyst> Got it. And I think my follow-up, again, I'm trying to get this from the outside in, but I'd appreciate any color. Like understand the refinement here on looking at those workloads to grow faster, but I think Michael had made the earlier point as well that because of this go-to-market effort, you almost by default have less visibility into that customer because you have reduced the friction to adopt. So can you help me think about how you guys are refining that focus on acquiring those right workloads just given that reduced visibility we have?
>
> * * *
>
> <A: Michael Lawrence Gordon> The other thing, Mike, just not to get lost in the details, but I wouldn't quite use the word visibility. But I do think if you think about it this way, if you're going through the process of negotiating a commitment with the customer, you're going to get an enormous amount of information from that customer about the workload and about everything else. And so when you're moving in a frictionless manner to get more workloads, you won't get all of that information.
>
> It's still possible with intent and purpose and incentives to get some of that information. And getting that little bit of relevant information is dramatically different than getting a commitment, right? And so that's the balance that we're just -- we're trying to strike and that we're continuing to iterate as we learn here.
>
> <A: Dev C. Ittycheria> Yes. And also I just want to add, it's not that we're anti commitments. We want to -- the customer to feel like, okay, I see enough volume either through this one workload or through the multitude of workloads they have to make a bigger commitment. And it's a much more natural conversation than trying to prematurely force a commitment when the customer themselves may not know how quickly that workload is going to grow. And so consequently, we'll struggle to figure out like what kind of commitment they want to sign up for.

79. While Defendants disclosed the slowed growth and execution issues to investors, causing MongoDB's stock to lose nearly a quarter of its value, they failed to tell investors why it took them well over a year – and in fact up to 15 months for some workloads – to disclose the slowed growth from the FY 2024 workloads when: (1) Defendants tracked customer consumption

religiously and discussed forecasting based on that consumption on a weekly and quarterly basis; and (2) the Company's head of sales revealed that new customers acquired in 2023 were not consuming and the Company had already revamped the previous year's compensation plan by November 2023. In fact, Gordon admitted that the amount of time needed to get feedback on new workload performance was only a few months. Just after the Class Period, Gordon confirmed that incremental data had already "verified" that FY 2025 compensation adjustments were a "good change to make" (i.e., four months after their implementation).

80. Investors reacted promptly to these revelations. The price of MongoDB's common stock declined dramatically, from a closing price of $310.00 per share on May 30, 2024 to $236.06 per share on May 31, 2024, a decline of nearly 24% in the span of one day.

**D. Defendants' Insider Trading**

81. By June 1, 2023, the start of the Relevant Time Period, the Company had at least four months, including one full quarter, worth of data to evaluate the quality of the new workloads and consumption rates. By November 2023, the Company knew that there were issues with the reliability of its data, that the focus on new workloads was not leading to growth in consumption rates, and that consumptions generally were decelerating or decreasing.

82. Armed with this knowledge, Defendants Ittycheria, Gordon, Pech, Botha, Cochran and Merriman embarked on a massive insider selling spree. Defendant Ittycheria's largest sales took place on November 7, 2023, [redacted], for proceeds of over $37 million. Defendant Gordon sold $28 million worth of stock in the month of November alone. All told, Defendants Ittycheria, Gordon, Pech, Botha, Cochran and Merriman sold over $286 million worth of stock during the Relevant Time Period, when they had access to information showing that consumption rates were decelerating, and the public did not.

**Defendant Ittycheria**

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| 06/01/23 | 20,000 | $5,746,448 |
| 07/05/23 | 50,000 | $20,353,296 |
| 09/26/23 | 134,000 | $43,845,181 |
| 11/01/23 | 33,500 | $11,317,534 |
| 11/07/23 | 100,500 | $37,687,500 |
| 12/01/23 | 33,000 | $13,811,148 |
| 01/02/24 | 33,000 | $12,760,484 |
| 02/01/24 | 33,000 | $13,033,893 |
| 03/01/24 | 33,000 | $14,478,288 |
| **TOTAL** | **470,000** | **$173,033,772** |

**Defendant Gordon**

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| 07/03/23 | 2,197 | $893,723 |
| 09/14/23 | 5,000 | $1,854,119 |
| 10/02/23 | 5,000 | $1,732,722 |
| 11/01/23 | 5,000 | $1,690,079 |
| 11/13/23 | 5,404 | $2,076,649 |
| 11/14/23 | 5,038 | $2,005,577 |
| 11/20/23 | 21,498 | $8,821,059 |
| 11/21/23 | 5,830 | $2,394,861 |
| 11/22/23 | 10,097 | $4,140,073 |
| 11/27/23 | 7,577 | $3,106,797 |
| 11/29/23 | 5,608 | $2,321,207 |
| 11/30/23 | 5,279 | $2,308,397 |
| 02/05/24 | 5,306 | $2,381,214 |
| 02/08/24 | 10,000 | $4,698,422 |
| 02/09/24 | 10,000 | $4,860,357 |
| **TOTAL** | **108,834** | **$45,285,256** |

**Defendant Pech**

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| 07/06/23 | 15,000 | 5,971,125 |
| 09/07/23 | 16,143 | 6,115,921 |
| 09/27/23 | 308 | 100,491 |
| 09/29/23 | 308 | $108,739 |
| 10/03/23 | 1,212 | 413,316 |
| 10/06/23 | 1,212 | 424,200 |

| | | |
|---|---|---|
| 11/14/23 | 1,563 | 625,200 |
| 01/03/24 | 2,422 | 905,247 |
| 01/16/24 | 1,248 | 499,200 |
| 04/03/24 | 4,726 | 1,622,719 |
| 04/04/24 | 4,726 | 1,654,100 |
| **TOTAL** | **48,868** | **$18,440,258** |

**Defendant Merriman**

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| 06/01/23 | 3,000 | $855,930 |
| 06/02/23 | 2,000 | $762,240 |
| 07/03/23 | 5,000 | $2,035,458 |
| 07/10/23 | 606 | $231,740 |
| 07/18/23 | 1,000 | $420,000 |
| 08/01/23 | 2,000 | $840,000 |
| 08/04/23 | 6,000 | $2,490,360 |
| 09/01/23 | 1,000 | $395,010 |
| 09/05/23 | 6,000 | $2,337,000 |
| 10/02/23 | 1,000 | $342,390 |
| 10/03/23 | 4,000 | $1,354,032 |
| 10/10/23 | 2,000 | $730,000 |
| 11/01/23 | 1,000 | $345,210 |
| 11/03/23 | 4,000 | $1,328,933 |
| 11/07/23 | 2,000 | $730,600 |
| 11/29/23 | 1,000 | $420,060 |
| 12/01/23 | 2,000 | $840,627 |
| 12/04/23 | 6,000 | $2,623,988 |
| 12/28/23 | 2,375 | $986,908 |
| 01/02/24 | 1,000 | $401,712 |
| 01/03/24 | 6,000 | $2,246,375 |
| 01/22/24 | 1,000 | $420,000 |
| 02/01/24 | 1,000 | $404,196 |
| 02/02/24 | 1,000 | $420,000 |
| 02/05/24 | 6,000 | $2,627,940 |
| 02/08/24 | 2,000 | $930,740 |
| 03/01/24 | 2,000 | $873,613 |
| 03/04/24 | 6,000 | $2,592,885 |
| 04/01/24 | 1,000 | $363,008 |
| 04/03/24 | 4,000 | $1,364,500 |
| 04/08/24 | 2,000 | $730,000 |
| 05/01/24 | 1,000 | $379,150 |
| 05/03/24 | 6,000 | $2,249,706 |
| **TOTAL** | **91,981** | **$36,074,311** |

**Defendant Cochran**

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| 06/02/23 | 2,000 | $762,240 |
| 06/15/23 | 2,174 | $811,315 |
| 09/15/23 | 2,174 | $785,488 |
| 12/28/23 | 2,175 | $905,213 |
| 04/01/24 | 2,175 | $789,830 |
| **TOTAL** | **10,698** | **$4,054,086** |

**Defendant Botha**

| Date of Sale | Shares Sold | Proceeds |
|---|---|---|
| 03/13/24 | 27,000 | 10,046,210 |
| **TOTAL** | **27,000** | **$10,046,210** |

83. The court in the Securities Class Action recognized the sales made by Defendants Ittycheria and Gordon to be suspicious and evidence of fraudulent intent. The court found the plaintiffs to have plausibly pleaded that the amount of sales are suspicious. As the court stated in its opinion denying the defendants' motion to dismiss:

> Mr. Ittycheria and Mr. Gordon are alleged to have sold a combined $234 million worth of stock during the Class Period; a significant sum. Specifically, Lead Plaintiffs allege that Mr. Ittycheria sold approximately $184.21 million worth of MongoDB common stock, accounting for 68% of his holdings. And Mr. Gordon sold approximately $50.09 million worth of MongoDB stock, accounting for 59% of his holdings. Lead Plaintiffs also allege that Mr. Ittycheria nearly doubled his profits from the previous year and Mr. Gordon earned nearly eighteen times what he did in the preceding year. The portion of stockholdings sold, and the profits earned, supports that the amount of stock sold was "unusual in light of [] past trading practices" because the Individual Defendants were alleged to be selling much more conservatively in preceding years where new workloads were consuming as expected.

(Citations omitted.)

84. The timing of the sales are also suspicious, according to the court in the Securities Class Action. The court noted that on June 1, 2023, when Defendant Ittycheria stated "it's all about

us acquiring high-quality workloads" and "if we can []acquire high-quality workloads . . . good things will happen, and that's happening," he sold 20,000 shares of stock for $5.7 million in proceeds. "Because Lead Plaintiffs plead that the stock sales were timed to account for Defendants' statements in order to inflate stock prices," the court found, "they have adequately pleaded that the timing of the sales was also suspicious."

85. In addition, the sales differed significantly from transactions in the 12 months prior to the beginning of the Relevant Time Period. For example, before the Relevant Time Period, Defendant Cochran made three sales: 1,000 shares on August 5, 2022, 1,175 shares on December 15, 2022, and 1,175 shares on April 3, 2023, for a total of 3,350 shares sold. Yet during the Relevant Time Period she sold more than three times that amount. Defendant Botha had no sales in the 12 months prior to the start of the Relevant Time Period. During the Relevant Time Period, Defendant Ittycheria earned almost twice as much in proceeds from sales made during the preceding 12 months; Defendant Pech earned 2.5 times as much and Defendant Gordon earned almost 18 times as much as from the proceeds from sales made in the 12 months prior to the start of the Relevant Time Period.

86. That the majority of the sales occurred under Rule 10b5-1 trading plans does not remove the taint of fraud from the stock sales. Defendant Ittycheria adopted his Rule 10b5-1 trading plan on June 26, 2023, during the Relevant Time Period and after making statements about "high-quality workloads." Defendant Gordon adopted his Rule 10b5-1 trading plan on June 9, 2023, also during the Relevant Time Period, while Defendant Pech adopted a Rule 10b5-1 trading plan on June 28, 2023. Defendant Cochran adopted a Rule 10b5-1 trading plan on September 28, 2023. While Defendant Cochran's sales in June 2023 and September 2023 were allegedly made pursuant to a Rule 10b5-1 trading plan, there is no indication of when that plan was adopted or

when it terminated. As the court in the Securities Class Action noted, when "executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations." (Citations omitted.) The timing of the Rule 10b5-1 trading plans, according to the court, "lends additional support to the inference that Defendants [in the Securities Class Action] had motive and opportunity."

**E. Officer Exits and Court Findings**

87. Certain officers at MongoDB began facing adverse employment experiences after the truth was revealed. On December 9, 2024, the Company announced that Defendant Gordon was resigning effective January 31, 2025. Defendant Tanjga was appointed as interim CFO on February 1, 2025, but the Company announced on April 21, 2025, that Defendant Tanjga was resigning effective May 8, 2025.

88. On November 3, 2025, MongoDB announced that Defendant Ittycheria would be resigning, effective November 9, 2025. In connection with his resignation, Defendant Ittycheria agreed to serve as an advisor to the Board and the new CEO for one year, after which he would resign from the Board as well.

89. Then, Defendant Pech resigned on April 15, 2026.

90. The Securities Class Action was filed against MongoDB and Defendants Ittycheria and Gordon on July 9, 2024. Defendant Tanjga was added as a defendant in the Securities Class Action on January 27, 2025. The plaintiffs in the Securities Class Action alleged that the Company and Defendants Ittycheria, Gordon, and Tanjga made false and misleading statements about the quality or the Company's client workloads and consumption rates. The defendants in that action moved to dismiss the complaint for failure to state a claim.

91. The Court denied the motion to dismiss on April 30, 2026. In its order, the Court noted that workload acquisitions and consumption rates were "the heart of MongoDB's business." The Court found that the plaintiffs in the Securities Class Action had sufficiently plead that statements concerning the quality of workloads and the stability or steadiness of consumption rates were false and misleading. The Court similarly found that the plaintiffs had adequately plead that statements made describing consumption rates as "stable," "steady," or "as expected" trigged a duty to disclose information on FY 2024 workload consumption rates, starting in January 2024.

92. Crucially, the Court found that Defendants Ittycheria, Gordon, and Tanjga had actual knowledge of the consumption rate data and kept close track of consumption rates when the false and misleading statements were made. The Court stated:

> And because Defendants' own statements "indicate that they were in fact monitoring contemporaneous statistics," with respect to the FY 2024 new workloads' consumption rates, the statements provide "strong circumstantial evidence that [the defendants] were receiving some form of specific information" as to consumption rates. Accordingly, because Lead Plaintiffs have adequately pleaded that the Individual Defendants had access to and were aware of data with respect to the FY 2024 new workloads' consumption rates, they have adequately pleaded a strong inference of conscious misbehavior or recklessness.

(Quotations omitted.)

93. The Court also found that the plaintiffs in the Securities Class Action had adequately plead that Defendants Ittycheria and Gordon had engaged in insider sales that "give rise to a strong inference of fraudulent intent." The amount and timing of the sales as alleged by the plaintiffs were adequate to establish a strong inference of scienter under "motive and opportunity."

94. Furthermore, because Defendants Ittycheria, Gordon and Tanjga "acted with motive and opportunity and recklessness and conscious disregard," the Court found that the plaintiffs in the Securities Class Action had also adequately pleaded corporate scienter.

**F. The Board was Complicit in the Misconduct**

95. During the Relevant Time Period, the Audit Committee of the Board held meetings where the Audit Committee discussed SEC filings and earnings releases that were to be issued. For example, the Audit Committee discussed [redacted]. MongoDB220BA_00001507-8. In the meeting held on February 21, 2024, the Audit Committee discussed [redacted] MongoDB220BA_00001509-11. Specifically, the Audit Committee was informed that [redacted] MongoDB220BA_00002237. The March 12, 2024, Audit Committee meeting discussed [redacted]. MongoDB220BA_00001524-6. For its meeting on May 22, 2024, the Audit Committee was informed that [redacted] MongoDB220BA_00001739. During that meeting, the Audit Committee discussed [redacted]. MongoDB220BA_00002183-6.

96. The Board held a meeting on November 16, 2023. On the agenda for that meeting was [redacted] MongoDB220BA_00002290. The Board [redacted] MongoDB220BA_00002124. The Board [redacted]

[redacted] *Id.*

97. For the meeting the Board [redacted]

MongoDB220BA_00002328.

98. The November 2023 Board meeting [redacted]

[redacted]

MongoDB220BA_00002329.

99. The Board [redacted]

MongoDB220BA_00002427.

100. The Board [redacted]

MongoDB220BA_00001358-74. [redacted]

[redacted]

[redacted]

[redacted]

MongoDB220BA_1358-9.

101. [redacted] MongoDB220BA_00001370.

102. On February 7, 2024, the Board held a meeting to discuss [redacted] MongoDB220BA_00002128-9. The Board materials for that meeting included [redacted]

[redacted]

MongoDB220BA_00001387.

103. The Board [redacted]

[redacted]

MongoDB220BA_00001389.

104. [redacted]

[redacted]

MongoDB220BA_00001390.

105. The Board materials [redacted]

MongoDB220BA_00001393.

106. The Board materials [redacted]

[redacted]

MongoDB220BA_00001404.

107. The Board held a meeting on February 22, 2024. On the agenda for that meeting was [redacted] MongoDB220BA_00002529. The Board [redacted] MongoDB220BA_00002132. The Board [redacted] MongoDB220BA_00002133.

108. For the meeting the Board [redacted]

MongoDB220BA_00002588.

109. The February 22, 2024 Board meeting [redacted]

MongoDB220BA_00002589.

110. The Board [redacted]

[redacted]

MongoDB220BA_00002614.

111. The Board [redacted]

[redacted]

MongoDB220BA_00002666.

112. [redacted]

MongoDB220BA_00002683.

113. The Board [redacted]

MongoDB220BA_00001417-42. [redacted]

MongoDB220BA_1417.

114. [redacted] MongoDB220BA_00001431. [redacted] MongoDB220BA_00001433.

115. [redacted]

[redacted]

MongoDB220BA_00001435-6.

116. The Board met again on May 23, 2024. During that meeting, the Board discussed [redacted]. MongoDB220BA_00002080. The Board [redacted]:

[redacted]

MongoDB220BA_0001921.

117. During the meeting, the Board [redacted]

[redacted]

MongoDB220BA_00001922.

118. The Board [redacted]

MongoDB220BA_00001923.

119. For the May 23, 2024 Board meeting, the Board [redacted] MongoDB220BA_00001934.

120. The Board [redacted]

MongoDB220BA_00002014.

121. The Board also discussed [redacted]. MongoDB220BA_00002080.

122. The Board [redacted] MongoDB220BA_00001444-60. [redacted]

MongoDB220BA_00001444.

123. [redacted] MongoDB220BA_00001451. [redacted]

[redacted]

MongoDB220BA_00001452.

**G. Defendants' Misconduct Has and Continues to Harm the Company**

124. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *Baxter v. MongoDB, Inc., et al.*, Case No. 1:24-cv-05191 (S.D.N.Y), as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

125. MongoDB's reputation and goodwill have also been damaged by the Defendants' misconduct.

126. During the Relevant Time Period, the Company paid more than $46.1 million in compensation to Defendants Ittycheria and Gordon:

| | **FY 2024** | **FY 2025** |
|---|---|---|
| Defendant Ittycheria | $15,291,447 | $15,843,345 |
| Defendant Gordon | $7,681,597 | $7,302,955 |
| **TOTAL:** | **$22,973,044** | **$23,146,300** |

127. The Defendants failed to oversee and manage the Company in accordance with their fiduciary duties and Company policies, making the compensation provided by the Company excessive. The Officer Defendants received millions of dollars in equity compensation based on

stock prices that had been inflated because of the false and misleading statements made or caused by the Defendants. The Board has not clawed back any of this compensation.

**H. MongoDB Issues a False and Misleading Proxy Statement**

128. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Time Period, the Schedule 14A Proxy Statement issued on May 16, 2024 (the "2024 Proxy"), that sought stockholder votes to, among other things, re-elect Defendants Botha, Ittycheria, and Lewnes to serve on the Board.

129. The Director Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy before it was filed with the SEC and disseminated to MongoDB's stockholders. The Director Defendants negligently issued materially misleading statements in the 2024 Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies allegations and related claims.

130. In support of re-electing Defendants Botha, Ittycheria, and Lewnes, the Director Defendants highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

> ***Board of Directors Risk Oversight***
>
> Our board of directors is responsible for, and committed to, the oversight of our long-term strategic plan and significant enterprise-wide risks. In carrying out this responsibility, our board of directors applies an enterprise-wide approach to risk management. This approach is designed to support organizational objectives, such as short- and long-term strategic objectives and enhancement of stockholder value. A fundamental part of risk management is not only understanding the most significant risks a company faces and what steps management is taking to manage

those risks, but also understanding what level of risk is appropriate for a given company. The involvement of our full board of directors in reviewing our business is an integral aspect of its assessment of management's tolerance for risk and also its determination of what constitutes an appropriate level of risk.

In connection with its reviews of the operations of our business, our board of directors addresses the primary risks associated with our business including, for example, strategic planning, liquidity risk, organizational risk and operational risk.

Our board of directors appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge.

***Committee Risk Oversight***

Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through our board of directors as a whole, as well as through various standing committees of our board of directors that address risks inherent in their respective areas of oversight. Our board of directors regularly reviews information regarding our operational, financial, legal, data security and strategic risks. Additionally, senior risk management personnel attend quarterly meetings of our board of directors, provide presentations on operations including significant risks, and are available to address any questions or concerns raised by our board of directors.

In particular, our audit committee has the responsibility to consider and discuss our major financial and security risk exposures and the steps our management has taken to monitor and mitigate these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Our audit committee also monitors compliance with legal and regulatory requirements. Our audit committee further oversees initiatives related to cybersecurity, including prevention of attacks and monitoring of our systems, as well as our Enterprise Risk Management program. In addition, among other matters, management provides our audit committee periodic reports on our compliance programs and investment policy and practices.

Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. The compensation committee also oversees risks relating to the recruiting and retention of our executive officers and our broader compensation philosophy.

Our nominating and corporate governance committee monitors the effectiveness of our Corporate Governance Guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. The nominating and corporate governance committee also assists the board of directors in monitoring our governance and board of directors' succession risks.

> At periodic meetings of our board of directors and its committees, management reports to and seeks guidance from our board and its committees with respect to the most significant risks that could affect our business, such as competition risks, legal risks, information security and privacy risks, and financial, tax and audit related risks.

131. The 2024 Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning MongoDB's projected revenues and growth for fiscal year 2025 and the impact thereon from the restructuring of the sales force.

132. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect Defendants Botha, Ittycheria, and Lewnes to the Board.

## I. The Board Breached its Fiduciary Duties

133. As officers and/or directors of MongoDB, the Defendants owed MongoDB fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage MongoDB in a fair, just, honest and equitable manner. The conduct of the Defendants involves a knowing or reckless violation of their obligations as directors and officers of MongoDB, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

134. Defendants, because of their positions of control and authority as directors and/or officers of MongoDB, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding MongoDB's

financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

135. To discharge their duties, the officers and directors of MongoDB were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and MongoDB were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

136. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

137. The Board's Audit Committee is tasked with overseeing MongoDB's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of MongoDB's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- **Audited Financial Statement Review; Quarterly and Annual Reports**. The Committee will review the annual audited financial statements and quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and

Results of Operations" in MongoDB's Annual Report on Form 10-K and its Quarterly Reports on Form 10-Q, with MongoDB management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in MongoDB's Annual Report on Form 10-K.

- **Earnings Announcements**. The Committee will review and discuss with MongoDB management and the Auditors any earnings press releases and other financial information regarding MongoDB's results of operations.

- **Internal Control over Financial Reporting; Disclosure Controls**. The Committee will confer with MongoDB management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and MongoDB's disclosure controls and procedures. The review of internal control over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

- **Ethical Compliance**. The Committee will review the results of management's efforts to monitor compliance with MongoDB's programs and policies adhering to applicable laws and rules, including MongoDB's Code of Conduct.

138. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Botha, Cochran, and Hazard conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

139. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's

financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

140. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on MongoDB.

**J. Plaintiff Diligently Pursued a Section 220 Investigation**

141. The disturbing pattern of corporate conduct outlined above prompted Plaintiff to seek inspection of MongoDB's books and records pursuant to 8 *Del. C.* § 220 (the "220 Demand"). On March 31, 2025, Plaintiff demanded to inspect MongoDB's books and records as they related to the allegations above, including:

1. All minutes, agendas, presentations, exhibits, summaries, memoranda, outlines, scripts, talking points, and notes concerning meetings, resolutions or acts by written consent of the Board or any committee or subcommittee thereof between May 1, 2023 and May 31, 2024, that contained any discussion of:

    a. The Company's public disclosures to stockholders or the investing public, including SEC filings, press releases, and/or statements made during investor conference calls;

    b. The Company's compliance with laws or regulations concerning financial reporting;

    c. The Company's projected and actual financial results; and

    d. The Company's internal processes and protocols related to financial reporting and public disclosures.

> 2. All documents pertaining to the independence of the members of the Board, including but not limited to annual questionnaires for members of the Board relating to director independence, from 2023 to the date of this Demand.

142. MongoDB responded on April 23, 2025, arguing that the 220 Demand failed to establish a proper purpose and was overbroad. After meeting and conferring, Plaintiff and MongoDB negotiated a confidentiality agreement that was executed on June 11, 2025.

143. The Company produced documents on July 1, 2025 and November 14, 2025. In total, MongoDB produced 2,724 pages of documents in response to the 220 Demand.

## DERIVATIVE ALLEGATIONS

144. Plaintiff brings this action derivatively in the right and for the benefit of MongoDB to redress injuries suffered by MongoDB as a direct result of the Director Defendants' breaches of fiduciary duty. MongoDB is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

145. Plaintiff will adequately and fairly represent the interests of MongoDB in enforcing and prosecuting the Company's rights.

146. Plaintiff was a stockholder of MongoDB at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a MongoDB stockholder.

## DEMAND FUTILITY ALLEGATIONS

147. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

148. The MongoDB Board currently has ten members: Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea, Lewnes, and Merriman, as well as Chirantan J. Desai.

149. Plaintiff has not made any demand on MongoDB's current Board to institute this action against Defendants Ittycheria, Agrawal, Botha, Cochran, D'Souza, Hazard, Killalea,

Lewnes, and Merriman, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

150. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

151. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of MongoDB. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

### A. Demand is Excused as to Chirantan J. Desai

152. Chirantan J. Desai has served as the Company's President and CEO since November 2025. Mr. Desai received compensation of $52.8 million in fiscal year 2026 and depends on MongoDB for his income. In addition, MongoDB stated in the Schedule 14A Proxy

Statement filed with the SEC on May 19, 2026 (the "2026 Proxy") that Mr. Desai is not independent pursuant to Nasdaq rules.

**B. Demand is Excused as to Defendant Ittycheria**

153. Defendant Ittycheria served as the Company's President and CEO from 2014 until November 2025. Defendant Ittycheria received compensation of $16.2 million in fiscal year 2026, $15.8 million in fiscal year 2025, and $15.2 million in fiscal year 2024. Defendant Ittycheria entered into an advisory agreement with the Company in connection with his resignation, which provides an annual salary of $100,000 for informal management consultations until November 9, 2026. Until recently, Defendant Ittycheria depended on MongoDB for his income. In addition, MongoDB stated in the 2026 Proxy that Defendant Ittycheria is not independent pursuant to Nasdaq rules.

154. Defendant Ittycheria served as a director of the Company during the Relevant Time Period. As a director, Defendant Ittycheria had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Ittycheria was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

155. Defendant Ittycheria failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor MongoDB's controls, Defendant Ittycheria failed to protect corporate assets.

156. Defendant Ittycheria was an active participant in the misconduct described above. Defendant Ittycheria signed the 2024 10-K, as well as the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Ittycheria made false and misleading statements concerning

the quality of the Company's workloads and consumption rates. Defendant Ittycheria therefore faces a substantial likelihood of liability.

157. In addition, Defendant Ittycheria is a named defendant in the Securities Class Action.

158. Furthermore, Defendant Ittycheria made more than $173 million from stock sales made during the Relevant Time Period while in the possession of material, non-public information. The sales were suspicious in both the amount and the timing, making such sales fraudulent. Thus, Defendant Ittycheria faces a substantial likelihood of liability.

**C. Demand is Excused as to Defendant Agrawal**

159. Defendant Agrawal served as a director of the Company during the Relevant Time Period. As a director, Defendant Agrawal had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Agrawal was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

160. Defendant Agrawal failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor MongoDB's controls, Defendant Agrawal failed to protect corporate assets.

161. According to the 2026 Proxy, Defendant Agrawal received $284,789 in compensation in connection with her role as a Company director. Accordingly, Defendant Agrawal cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

162. Defendant Agrawal was an active participant in the misconduct described above. Defendant Agrawal signed the 2024 10-K. Defendant Agrawal therefore faces a substantial likelihood of liability.

**D. Demand is Excused as to Defendant Botha**

163. Defendant Botha served as a director of the Company during the Relevant Time Period. As a director, Defendant Botha had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Botha was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

164. Defendant Botha failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor MongoDB's controls, Defendant Botha failed to protect corporate assets.

165. According to the 2026 Proxy, Defendant Botha received $287,289 in compensation in connection with his role as a Company director. Accordingly, Defendant Botha cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

166. Defendant Botha was an active participant in the misconduct described above. Defendant Botha signed the 2024 10-K. Defendant Botha therefore faces a substantial likelihood of liability.

167. Furthermore, Defendant Botha made more than $10 million from stock sales made during the Relevant Time Period while in the possession of material, non-public information. The

sales were suspicious in both the amount and the timing, making such sales fraudulent. Thus, Defendant Botha faces a substantial likelihood of liability.

168. Defendant Botha served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing the disclosures made in SEC filings, the information provided in earnings releases, and the efficiency of the Company's internal controls over financial reporting. The Audit Committee was thus responsible for reviewing and approving MongoDB's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Botha was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's workloads and consumption rates.

169. Defendant Botha knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Botha breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Botha faces a substantial likelihood of liability for these breaches, making any demand on Defendant Botha futile.

**E. Demand is Excused as to Defendant Cochran**

170. Defendant Cochran served as a director of the Company during the Relevant Time Period. As a director, Defendant Cochran had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Cochran was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

171. Defendant Cochran failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor MongoDB's controls, Defendant Cochran failed to protect corporate assets.

172. According to the 2026 Proxy, Defendant Cochran received $302,289 in compensation in connection with her role as a Company director. Accordingly, Defendant Cochran cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

173. Defendant Cochran was an active participant in the misconduct described above. Defendant Cochran signed the 2024 10-K. Defendant Cochran therefore faces a substantial likelihood of liability.

174. Furthermore, Defendant Cochran made more than $4 million from stock sales made during the Relevant Time Period while in the possession of material, non-public information. The sales were suspicious in both the amount and the timing, making such sales fraudulent. Thus, Defendant Cochran faces a substantial likelihood of liability.

175. Defendant Cochran served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing the disclosures made in SEC filings, the information provided in earnings releases, and the efficiency of the Company's internal controls over financial reporting. The Audit Committee was thus responsible for reviewing and approving MongoDB's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Cochran was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's workloads and consumption rates.

176. Defendant Cochran knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Cochran breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Cochran faces a substantial likelihood of liability for these breaches, making any demand on Defendant Cochran futile.

**F. Demand is Excused as to Defendant D'Souza**

177. Defendant D'Souza served as a director of the Company during the Relevant Time Period. As a director, Defendant D'Souza had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant D'Souza was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

178. Defendant D'Souza failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor MongoDB's controls, Defendant D'Souza failed to protect corporate assets.

179. According to the 2026 Proxy, Defendant D'Souza received $296,289 in compensation in connection with his role as a Company director. Accordingly, Defendant D'Souza cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

180. Defendant D'Souza was an active participant in the misconduct described above. Defendant D'Souza signed the 2024 10-K. Defendant D'Souza therefore faces a substantial likelihood of liability.

**G. Demand is Excused as to Defendant Hazard**

181. Defendant Hazard served as a director of the Company during the Relevant Time Period. As a director, Defendant Hazard had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Hazard was also

required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

182. Defendant Hazard failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor MongoDB's controls, Defendant Hazard failed to protect corporate assets.

183. According to the 2026 Proxy, Defendant Hazard received $301,289 in compensation in connection with his role as a Company director. Accordingly, Defendant Hazard cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

184. Defendant Hazard was an active participant in the misconduct described above. Defendant Hazard signed the 2024 10-K. Defendant Hazard therefore faces a substantial likelihood of liability.

185. Defendant Hazard served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing the disclosures made in SEC filings, the information provided in earnings releases, and the efficiency of the Company's internal controls over financial reporting. The Audit Committee was thus responsible for reviewing and approving MongoDB's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Hazard was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's workloads and consumption rates.

186. Defendant Hazard knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Hazard breached the fiduciary duty of loyalty and good

faith by participating in the misconduct described above. Defendant Hazard faces a substantial likelihood of liability for these breaches, making any demand on Defendant Hazard futile.

**H. Demand is Excused as to Defendant Killalea**

187. Defendant Killalea served as a director of the Company during the Relevant Time Period. As a director, Defendant Killalea had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Killalea was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

188. Defendant Killalea failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor MongoDB's controls, Defendant Killalea failed to protect corporate assets.

189. According to the 2026 Proxy, Defendant Killalea received $318,789 in compensation in connection with his role as a Company director. Accordingly, Defendant Killalea cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

190. Defendant Killalea was an active participant in the misconduct described above. Defendant Killalea signed the 2024 10-K. Defendant Killalea therefore faces a substantial likelihood of liability.

**I. Demand is Excused as to Defendant Lewnes**

191. Defendant Lewnes served as a director of the Company during the Relevant Time Period. As a director, Defendant Lewnes had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations,

prospects, internal controls, and financial statements were accurate. Defendant Lewnes was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

192. Defendant Lewnes failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor MongoDB's controls, Defendant Lewnes failed to protect corporate assets.

193. According to the 2026 Proxy, Defendant Lewnes received $288,789 in compensation in connection with her role as a Company director. Defendant Lewnes is not otherwise employed. Accordingly, Defendant Lewnes cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

194. Defendant Lewnes was an active participant in the misconduct described above. Defendant Lewnes signed the 2024 10-K. Defendant Lewnes therefore faces a substantial likelihood of liability.

**J. Demand is Excused as to Defendant Merriman**

195. Defendant Merriman served as a director of the Company during the Relevant Time Period. As a director, Defendant Merriman had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Merriman was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

196. Defendant Merriman failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By

consciously disregarding the duty to monitor MongoDB's controls, Defendant Merriman failed to protect corporate assets.

197. According to the 2026 Proxy, Defendant Merriman received $281,289 in compensation in connection with his role as a Company director. Defendant Merriman is not otherwise employed. Accordingly, Defendant Merriman cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation. In addition, Defendant Merriman is a co-founder of the Company and was employed by the Company prior to joining the Board in 2020. Thus, Defendant Merriman cannot independently consider a demand.

198. Defendant Merriman was an active participant in the misconduct described above. Defendant Merriman signed the 2024 10-K. Defendant Merriman therefore faces a substantial likelihood of liability.

199. Furthermore, Defendant Merriman made more than $36 million from stock sales made during the Relevant Time Period while in the possession of material, non-public information. The sales were suspicious in both the amount and the timing, making such sales fraudulent. Thus, Defendant Merriman faces a substantial likelihood of liability.

200. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

## COUNT I

## Breach of Fiduciary Duty
## (Derivatively Against The Director Defendants)

201. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

202. Each of the Director Defendants owed and owes MongoDB the highest obligations of loyalty, good faith, due care, and oversight.

203. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

204. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

205. In addition, the Director Defendants further breached their fiduciary duties owed to MongoDB by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that the consumption rates for Atlas were not in line with historical rates and were, in fact decreasing. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

206. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain

adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

207. As a direct and proximate result of the breaches of duty alleged herein, MongoDB has sustained and will sustain significant damages.

208. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

209. Plaintiff, on behalf of MongoDB, has no adequate remedy at law.

**COUNT II**

**Breach of Fiduciary Duty**
**(Derivatively Against the Officer Defendants)**

210. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

211. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe MongoDB the highest obligations of loyalty, good faith, due care, oversight, and candor.

212. The Officer Defendants breached their fiduciary duties owed to MongoDB by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that the consumption rates for Atlas

were not in line with historical rates and were, in fact decreasing. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

213. As a direct and proximate result of the breaches of duty alleged herein, MongoDB has sustained and will sustain significant damages.

214. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

215. Plaintiff, on behalf of MongoDB, has no adequate remedy at law.

## COUNT III

### Gross Mismanagement
### (Against All Defendants)

216. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

217. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

218. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

219. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, MongoDB has sustained and will sustain significant damages.

220. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

221. Plaintiff, on behalf of MongoDB, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Derivatively Against All Defendants)

222. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

223. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

224. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

225. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, MongoDB has sustained significant damages.

226. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

227. Plaintiff, on behalf of MongoDB, has no adequate remedy at law.

## COUNT V

### Unjust Enrichment
### (Derivatively Against the Officer Defendants)

228. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

229. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

230. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

231. Plaintiff, on behalf of MongoDB, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VI

### Insider Trading
### (Derivatively Against Defendants Ittycheria, Gordon, Pech, Botha, Cochran, and Merriman)

232. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

233. By reason of their fiduciary roles as officers and directors of the Company, Defendants Ittycheria, Gordon, Pech, Botha, Cochran, and Merriman specifically owed the Company the highest obligations of due care, good faith and loyalty.

234. As officers of the Company, Defendants Ittycheria, Gordon, Pech, Botha, Cochran, and Merriman were given access to material information about the Company that was not generally available to the public, namely, that the consumption rates for Atlas were not in line with historical rates and were, in fact decreasing.

235. When Defendants Ittycheria, Gordon, Pech, Botha, Cochran, and Merriman sold their MongoDB stock, they were in possession of material, non-public information. The sales were made on the basis of such information and were material to Defendants Ittycheria, Gordon, Pech, Botha, Cochran, and Merriman.

236. The use of the Company's material, non-public information for their own gain is a breach of Defendants Ittycheria, Gordon, Pech, Botha, Cochran, and Merriman fiduciary duties to the Company.

237. Plaintiff, on behalf of MongoDB, seeks restitution from Defendants Ittycheria, Gordon, Pech, Botha, Cochran, and Merriman, and seeks an order from this Court disgorging all profits obtained by Defendants Ittycheria, Gordon, Pech, Botha, Cochran, and Merriman due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VII
## Violation of Section 14(a) of the Exchange Act
## (Against The Director Defendants)

238. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

239. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

240. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained

in the 2024 Proxy. In the 2024 Proxy, the Board solicited stockholder votes to reelect Defendants Botha, Ittycheria, and Lewnes to the Board.

241. The 2024 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, MongoDB misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

242. Plaintiff, on behalf of MongoDB, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2024 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of MongoDB and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of MongoDB for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding MongoDB restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June 30, 2026

**ROWLEY LAW PLLC**

Shane T. Rowley (SR-0740)
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

**BRIAN MURRAY LAW PLLC**
Brian P. Murray
750 E. Main Street
Suite 620
Stamford, CT 06901
Tel: (203) 246-2368
Email : bmurray@brianmurraylaw.com

*Attorneys for Plaintiff*

# EXHIBIT A

**VERIFICATION**

I, Blake Andrews, am the named plaintiff in the foregoing derivative action. I have read the foregoing Verified Stockholder Derivative Complaint, know the contents thereof, and authorized its filing. The contents alleged therein are true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true. I further declare that I am a current holder, and have been a holder, of MongoDB, Inc., common stock during the time period in which the wrongful conduct alleged and complained of occurred.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23 day of June 2026.

Blake Andrews
Blake Andrews (Jun 23, 2026 12:29:22 EDT)

Blake Andrews